# STATE OF MICHIGAN

# COURT OF APPEALS

CENTRAL MICHIGAN CEMENTING
SERVICES, LLC,

Plaintiff-Appellee,

v

DEPARTMENT OF TREASURY,

Defendant-Appellant.

UNPUBLISHED
December 8, 2015

No. 323405
Court of Claims
LC No. 13-000011-MT

Before: SHAPIRO, P.J., and O'CONNELL and WILDER, JJ.

PER CURIAM.

Defendant, Department of Treasury (the Department) appeals as of right the trial court's order granting summary disposition to plaintiff, Central Michigan Cementing Services, LLC (CMCS). The trial court concluded that CMCS was exempt from use tax under the Use Tax Act, MCL 205.91 *et seq.*, because it was eligible to claim the industrial processing exemption, MCL 205.94o. The trial court ordered defendant to refund to CMCS $300,123.75, plus statutory interest, for the tax years at issue. We affirm in part, reverse in part, and remand.

## I. BACKGROUND FACTS

CMCS provides custom acid and cement, as well as pumping services, to oil and gas well companies throughout the state. It purchases items of tangible personal property—including two types of cement, fly ash, gel, chloride, sugar, water, acid, inhibitors, water, clay stabilizers, antisludging agents, xylene, and methanol—which it then uses to make specialty cements and acids that it transports to and uses in wells. The specialty cement constitutes 50-60% of the price on CMCS's customer invoices. In 2009, the Department audited CMCS. The Department's auditor determined that the industrial processing exemption did not apply to CMCS's cement pumping service or the tanks and vehicles CMCS uses to store and haul cement and acid. Ultimately, the Department determined that CMCS owed $212,895, plus penalties of $21,290 and interest of $63,664.39.

CMCS paid the amounts under protest and filed suit in the Court of Claims. In its motion for summary disposition, CMCS argued that it was eligible for the industrial processing exemption as an industrial processor under MCL 205.94o(1)(a), and as an entity that performed work on behalf of industrial processors under MCL 205.94o(1)(b) and (c). The trial court determined that CMCS was eligible for the exemption for the cement and acid because it was

-1-

both an industrial processor and performed industrial processing services for other industrial processors. It also concluded that the remainder of CMCS's cement pumpers, hauling equipment, and pumping equipment were exempt because CMS used them "to perform an industrial processing activity for or on behalf of an industrial processor."

## II. STANDARDS OF REVIEW

This Court reviews de novo the trial court's decision on a motion for summary disposition. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 115; 839 NW2d 223 (2013). A party is entitled to summary disposition under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." The trial court must consider all the documentary evidence in the light most favorable to the nonmoving party. *Gorman*, 302 Mich App at 115. A genuine issue of material fact exists if, when viewing the record in the light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Id*. at 116.

The Department largely does not dispute the facts in this case. Rather, it disputes the legal effect of those facts under the applicable tax statutes. This Court reviews de novo issues of statutory interpretation. *Paris Meadows, LLC v Kentwood*, 287 Mich App 136, 141; 783 NW2d 133 (2010). If the plain and ordinary meaning of a statute's language is clear, we will not engage in judicial construction. *Id*. We must read the statute as a whole, and "statutory provisions are *not* to be read in isolation[.]" *Robinson v Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010). We must also read the provisions of statutes in context and read subsections of cohesive statutory provisions together. *Id*.

## III. ANALYSIS

The Use Tax Act provides several exemptions from use tax. One of these is the industrial processing exemption, which provides that property sold to an industrial processor for use in industrial processing is exempt from use tax. MCL 205.94o(1)(a). Industrial processing is

> the activity of converting or conditioning tangible personal property by changing the form, composition, quality, combination, or character of the property for ultimate sale at retail or for use in the manufacturing of a product to be ultimately sold at retail . . . . [MCL 205.94o(7)(a).]

Industrial processing includes, among other things, production and assembly, engineering related to industrial processing, quality control, and storing in-process materials. MCL 205.94o(3). However, it excludes storing raw materials and maintenance of nonprocessing equipment. MCL 205.94o(6)(a) and (d). An industrial processor includes a person who uses tangible personal property to perform an industrial processing activity for or on behalf of an industrial processor, whether or not the person is an industrial processor. MCL 205.94o(1)(c).

A wide variety of tangible personal property is eligible under the industrial processing exemption:

> (a) Property that becomes an ingredient or component part of the finished product to be sold ultimately at retail or affixed to and made a structural part of real estate.

(b) Machinery, equipment, tools, dies, patterns, foundations for machinery or equipment, or other processing equipment used in an industrial processing activity and in their repair and maintenance.

(c) Property that is consumed or destroyed or that loses its identity in an industrial processing activity.

(d) Tangible personal property, not permanently affixed and not becoming a structural part of real estate, that becomes a part of, or is used and consumed in installation and maintenance of, systems used for an industrial processing activity.

(e) Fuel or energy used or consumed for an industrial processing activity.

(f) Machinery, equipment, or materials used within a plant site or between plant sites operated by the same person for movement of tangible personal property in the process of production. . . .

(g) Office equipment, including data processing equipment, used for an industrial processing activity.  [MCL 205.94o(4).]

There are, of course, exceptions.  Property that is not eligible for the exemption includes:

(a) Tangible personal property permanently affixed and becoming a structural part of real estate in this state including building utility systems such as heating, air conditioning, ventilating, plumbing, lighting, and electrical distribution, to the point of the last transformer, switch, valve, or other device at which point usable power, water, gas, steam, or air is diverted from distribution circuits for use in industrial processing.

* * *

(e) Tangible personal property used for receiving and storage of materials, supplies, parts, or components purchased by the user or consumer.

* * *

(g) Vehicles, including special bodies or attachments, required to display a vehicle permit or license plate to operate on public highways, except for a vehicle bearing a manufacturer's plate or a specially designed vehicle, together with parts, used to mix and agitate materials at a plant or job site in the concrete manufacturing process.  [MCL 205.94o(5).]

With this general statutory language in mind, we turn to the Department's specific issues.

A.  INDUSTRIAL PROCESSING

First, the Department contends that CMCS is not engaged in an industrial processing activity because, according to the Department, CMCS instead provides services for improving real property. We disagree.

In this case, CMCS purchases cement ingredients, as well as other chemicals, to manufacture specialty cement that is custom-blended to meet the needs of each specific customer. These custom-blended cement sales constitute 50-60% of the end cost to CMCS's customers. CMCS also hauls the cement to the customers' properties and pumps the cement to their desired locations. In essence, CMCS takes objects of tangible personal property, including cement mix and chemical compounds, and processes those compounds into a finished custom cement product for retail sale. CMCS engages in the same transformation and delivery of acid through use of its acid mixers and pumpers. We conclude that the trial court did not err when it determined that CMCS is engaged in an industrial processing activity under MCL 205.94o(4)(a). And because the Department premises its argument regarding CMCS's vehicles on its assertion that the cement is not exempt, we also reject that argument.

Regarding the finished products, the custom cement, pumps, and mixers were ultimately used in industrial processing by an industrial processor. The Department does not dispute that oil and gas producers are industrial processors. Cementing is an integral part of the safe production of oil. See *In re Deepwater Horizon*, 753 F3d 570, 575 (CA 5, 2014) ("[I]it is undisputed that the well's cement failed, resulting in the loss of controlled confinement of oil . . . ."). The finished cement became a material used in the installation and maintenance of the wells that oil and gas companies used for industrial processing under MCL 205.94o(4)(b).[1] CMCS uses its acid mixers and pumps to clean the wells for more efficient pumping operations. This would certainly constitute machinery and equipment used to repair and maintain industrial processing equipment under MCL 205.94o(4)(b). Accordingly, we also agree with the trial court that CMCS was entitled to a use tax exemption on its equipment because it used the equipment to provide materials and maintenance services for customers who were industrial processors.

## B. IMPROVEMENT OF REAL PROPERTY

Second, the Department contends that even if CMCS is an industrial processor, its products were not exempt from sales or use tax because the cement was permanently affixed to real estate in this state. We disagree.

"Tangible personal property permanently affixed and becoming a structural part of real estate in this state" is not eligible for the industrial processing exemption. MCL 205.94o(5)(a). To fall into the exemption exception, the property must be both permanently affixed to the real property *and* become a structural part of the real estate. *Granger Land Dev Co v Dep't of Treasury*, 286 Mich App 601, 610; 780 NW2d 611 (2009).

---

[1] Our discussion in this section does not include the eventual plugging of the finished wells by cementing them closed. The plugging of inactive wells after production has ended is a separate issue that we will discuss in Part I. C. of this opinion.

To determine whether personal property is permanently affixed to the real estate, courts consider a variety of factors on a case-by-case basis. *Id*. at 611. Relevant factors may include:

(1) whether the property was actually or constructively annexed to the real estate; (2) whether the property was adapted or applied to the use or purpose of that part of the realty to which the property in question is connected or appropriated; and (3) whether the property owner intended to make the property a permanent accession to the realty. [*Tuinier v Bedford Charter Twp*, 235 Mich App 663, 668; 599 NW2d 116 (1999).]

The trial court may also consider the length of time that processing occurs, whether it is impractical to process in a manufacturing facility, and whether the purpose of the addition is to improve the land or make it more valuable. See *Granger*, 286 Mich App at 611-612.

In this case, the cement was actually annexed to the real estate, but the property owner did not necessarily intend the drilling cement to make the property a permanent accession to the realty. Oil and gas processing takes an extended period of time, and the products must be extracted where they exist—they cannot be extracted in a facility. Finally, the purpose of the cement around the well is not to improve the land or make it more valuable. It is to assist in the safe production of oil and natural gas. We conclude that the trial court did not err when it determined that the cement, absent the eventual cement plugs, is not permanently affixed to the real estate.

Additionally, we note that the Department does not discuss the second requirement of this exception. The statutory language of MCL 205.94o(5)(a) employs the term "and." We must follow the literal meanings of the words "and" and "or" unless they render the statute dubious. *Meridian Charter Twp v Ingham Co Clerk*, 285 Mich App 581, 592; 777 NW2d 452 (2009). To be excluded from an exemption under MCL 205.94o(5)(a), the property must be *both* affixed to the real estate *and* a structural part of the real estate to fall within the exemption exception. MCL 205.94o(5)(a). "Structural" is defined as "of, relating to, or affecting structure: used in building structures." *Merriam-Webster's Collegiate Dictionary* (2014). Generally, cement is used to support structures, such as its use in building foundations. However, the Department provided no evidence that the cement is permanently supporting any structure in this case: the drills are eventually removed and the wells are sealed. Accordingly, the Department presented no evidence that the cement becomes a *structural* part of the real estate in this case.

We conclude that the trial court properly determined MCL 205.94o(5)(a) did not apply to exclude CMCS's cement from the industrial processing exemption because it was not permanently affixed to and a structural part of the real estate.

## C. PLUGGING WELLS

The trial court determined that plugging inactive wells after production had ceased was not an industrial processing activity, but it concluded that this did not affect the amount of

CMCS's refund. The Department contends that the trial court should not have given CMCS a full refund, but instead it should have determined what percentage of CMCS's business was attributable to plugging finished wells.[2] We agree.

The Department contended in part that "when CMCS performs a plugging job, the well hole is sealed using cement after the well owner discontinues operation of that well . . . . Thus the well is not in production at the time the plugging job takes place and industrial processing is not occurring." The trial court agreed, but it concluded that the nonexempt activity was mixed with the exempt portions of CMCS's overall operations and that CMCS was entitled to a full refund. It based its decision on *Detroit Edison Co v Dep't of Treasury*, 303 Mich App 612; 844 NW2d 198 (2014), which held that equipment used for both exempt and nonexempt purposes is subject to an exemption. This Court's decision was reversed by the Michigan Supreme Court, which stated that "under MCL 205.94o(2), when property is simultaneously used for both exempt and nonexempt activities, defendant must give some recognition to both exempt and nonexempt activity in calculating 'total use' under MCL 205.94o(2)." *Detroit Edison Co v Dep't of Treasury*, 498 Mich 28, 32; 869 NW2d 810 (2015).

CMCS contends that only 5% of its activities constituted plugging inactive wells. The Department argues that its auditor found that up to 50% of CMCS's activities involved plugging inactive wells. Thus, a factual dispute exists regarding the amount of use tax owed for CMCS's non-exempt activities in plugging inactive wells. We conclude that we must remand for the trial court to resolve this factual issue.

We reverse the trial court's determination that CMCS was exempt from use tax on the well-plugging portions of its activities and remand for a determination of how much tax CMCS owes for those activities. We affirm in all other respects. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Kurtis T. Wilder

---

[2] CMCS contends that the Department did not preserve this issue. An issue is preserved if it was raised before, addressed, or decided by the trial court or administrative tribunal. *Gen Motors Corp v Dep't of Treas*, 290 Mich App 355, 386; 803 NW2d 698 (2010). While the Department did not specifically invoke MCL 205.94o(2) in its apportionment argument, it did argue that CMCS was liable for those portions of its business that were nonexempt. The trial court also specifically addressed the application of MCL 205.94o(2). We conclude that this was sufficient to preserve this issue.